FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2019 JUN 18   AM 11 17

STEPHAN HARRIS, CLERK
CHEYENNE

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

WESLEY DALE VINCENT,

      Plaintiff,

      vs.                            Case No. 16-CV-270-J

AVA NELSON,

      Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on Defendant Ava Nelson's Motion for Summary Judgment (Doc. 64), the plaintiff's opposition to the motion (Doc. 67), and the defendant's further reply. (Doc. 68.) The Court has reviewed the parties' written submissions and materials offered in support of their respective positions, all matters of record, the applicable law and is fully advised. The Court now finds and orders that the defendant's motion for summary judgment should be DENIED, for the reasons stated below.

### STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side. *See Anderson*

1

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." *Anderson*, 477 U.S. at 255.

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine

2

dispute of material fact for trial. *See Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

When considering a motion for summary judgment, the court's role is not to weigh the evidence and decide the truth of the matter, but rather to determine whether a genuine dispute of material fact exists for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact-finder, not the court. *Id.* at 255.

## Background

For the background here, the Court incorporates the discussions in previous order denying the defendant's motion to dismiss the first amended complaint, and the parties' summary judgment submissions with their varying discussions and descriptions of the underlying event that gives rise to this civil action. The defendant has offered a statement of undisputed facts (Doc. 66) that has for the most part been rejected and includes many facts plaintiff disputes. Plaintiff has objected to and disagrees with the statements and inferences from the facts defendant claims are undisputed, including specifically enumerated paragraphs 10, 17, 19, 28, 30-33, 35-54, and 56. These purported "undisputed" facts are more appropriately genuine issues of material fact and fail to demonstrate that either party is entitled to judgment as a matter of law. This alone supports the Court's decision to deny the motion for summary judgment. However, having reviewed the parties' briefs, supporting materials, which include exhibits, affidavits and depositions totaling over 800 pages, it becomes very clear that the parties tell two stories that spin the facts so as to allow differing inferences to be drawn from those facts. This is something that is within the province of the jury as the finders of fact that

trial that must be resolved at trial.

This personal injury action arises out of a collision between two haul trucks during the night shift at Black Thunder Mine (sometimes "BTM") on October 13, 2013. Plaintiff Vincent ("Vincent" or plaintiff) was driving a haul truck and was hit by another haul truck driven by defendant Nelson ("Nelson" or defendant) at the Thunder Basin Coal Company ("TBCC") Black Thunder Mine in Campbell County, Wyoming. The accident occurred on the 4-East Access Ramp at the Black Thunder Mine. The action was brought against several defendants, including employees of TBCC: Kevin Hampleman, President of TBCC and Mine Manager for the BTM; Tim McCreary, Safety Manager for TBCC; Michael McGinty, Operations Superintendent for TBCC and/or Crew Supervisor; and Ava Nelson, a non-supervisory employee of TBCC at the BTM. All of the defendants except for Nelson have been dismissed from this action pursuant to stipulation of the parties. Docs. 62, 63.

Haul roads at the mine are often narrow, hazardous, and in many places are not wide enough for two of the largest haul trucks used in mining operations to safely pass. Vincent has alleged that road design is contrary to applicable industry safety and governmental standards and also contrary to the Thunder Basin Coal Company Ground Control Plan. He alleges the narrow haul roads were known to and did create safety hazards for workers operating equipment on those roads. There had been other complaints from employees and equipment operators about the safety hazards and dangers caused by the narrow haul roads. Vincent testified in his deposition that on the narrow section of the haul road he was driving on, it was not wide enough for a truck to pull over and allow another truck to pass safely. Doc. 67-11, at 36. Another driver who did not witness the accident, Bruce Jacobson,

4

stated during the investigation of the incident that he himself had met Nelson once that same night, without incident, but that he had not been sure there was enough room to meet and safely pass in that spot. Jacobson pulled over as far as he could, unsure but still thinking Nelson could make it past him; she was able to do so. Jacobson indicated his truck, Truck 151 (24'6"), was not as wide as that driven by Vincent, Truck 129 (27'), or the truck Nelson was driving, Truck 132 (25'). Investigation notes, Doc. 67-9. There is mention that the varying truck widths may have been a factor in the collision of the two haul trucks.

Vincent's expert, Jack Nebel, opined that the road was not wide enough for two way traffic. Doc. 67-2. Road conditions may change and vary. Doc. 67-3, 44, 46-47. One of the original defendants in this case, Mike McGinty, a supervisor at BTM, testified in his deposition:

A. The dimension of roads were sufficient for one-way traffic. If they wanted me to widen it to a two-way, it's going to take a bunch of engineering, a bunch of higher-up authority that's – than I'm going to do.

Q. So 4 East was a one-way, one-lane road?

A. Yes.

Q. Just for clarity, you certainly could have asked your supervisor for authority to widen a roadway at your meeting at the beginning of a shift?

A. You'd have to go get it redesigned by engineering.

Q. Here's --

A. You're wanting me to say do I have the authority to go in and widen a road? You just don't go in and widen a road. There's millions of yards of dirt in there.

5

Q. All I'm asking you is that you have the ability to say to your supervisor, "Can we get this area widened up?"

A. I've got the ability to say it to him. Whether I will or not is a different question.

Q. Okay. What are the considerations as to whether you will or not?

A. I guess I just wouldn't answer it, because I know it's going to be a one-way road in there. It's the way it's engineered. There's no reason to ask the question. It's an engineered -- engineering would have to answer that question. It's a safe one-way road.

MR. METIER: I don't have any further questions at this time.

EXAMINATION BY MR. WORTHEN:

Q. Mike, I just want to ask a couple quick clarification questions of you. Looking back at Exhibit 2, which is your handwritten notes, in there you describe that when it comes to the accident, that Ava's vehicle hit Dale's truck, stopped and then hit it again. What is the source of that information?

A. Dale.

Q. You didn't witness the accident?

A. No. I didn't witness the accident, no.

Q. Did you do any tests to try to establish how the accident occurred?

A. No.

Q. So you're just repeating what Dale told you?

A. True story.

Q. Okay. You were a haul truck driver for a number of years?

A. Oh, yeah.

Q. Do those trucks stop and start on a dime?

A. Oh, no. No. It takes a lot to slow them down.

Q. Does it take something to start them up?

A. Oh, yeah.

Q. Get them moving?

A. Yes, it does.

Q. So a haul -- driving a haul truck is not like driving a sports car?

A. No. No, it's not.

Q. You've talked to Mr. Metier quite a bit about this being a safe one-way road.

A. Correct.

Q. The night of the accident, do you recall determining how wide the road was at the time -- at the location the accident occurred?

A. Yeah. I believe when J. P. got down there, we stepped the road off, and I believe it was somewhere around 75 to 80 feet wide.

Q. What's the width of a haul truck?

A. 30 feet.

Q. So you're defining a narrow one-way road as a road that is -- if a truck's 30 feet, 75 to 80 feet, that's a -- that's a narrow road?

A. It's narrow to me because we usually like to have them 130 foot wide.

Q. So that's - that's two-way traffic, is130?

A. Yeah. Two trucks could fit through there.

Q. So the narrow roadway that we're dealing with here was 75 to 80 feet wide?

A. Sure. Yes.

Q. And that's --

MR. METIER: Objection.

Q. (BY MR. WORTHEN) And that's at the point where the accident occurred?

A. Yes.

Q. That's where you and J. P. stepped it off?

A. Yes.

Doc. 67-6, McGinty Depo. The McGinty deposition does not describe how a distance of 75-80 feet is stepped off.

In her deposition, Nelson acknowledged receipt of the employee handbook given to and signed by her. Doc. 67-8, 10. Introductory portions of the handbook include the following:

## Health and Safety

Safety is an important part of every employee's job. Safety is given primary consideration in all aspects of Company business. Programs have been established for employees' personal safety. Employee must never, under any circumstances, take unnecessary or unwarranted risks while performing their jobs. Employees are required to observe all safety and health rules. Employees must also obtain and properly use appropriate safety equipment and personal protective apparel required for the jobs they are performing. Failure to do so may result in disciplinary action, up to and including discharge.

Doc. 67-7, 12. In his deposition, McGinty agreed that safety is a guiding principle at TBCC and the top priority is making sure every miner returns home safe and healthy at the end of every shift. "Safety is number one." Doc. 67-6, 17-19.

On October 13, 2013 Vincent was preparing to drive a Komatsu 830, one of the largest haul trucks at the mine, down into the 4-East Access Ramp to be loaded with coal. The haul truck being driven by Nelson was loaded and coming up the ramp. Both Vincent and Nelson were driving Komatsu haul trucks. The Komatsu 830E is described by Jack Nebel in his report, which states in part:

> 8. Ava Nelson was driving a fully loaded Komatsu 830E. The truck body and bed weighed approximately 500,000 lbs. The pay load would have been approximately 480,000 lbs., for a total of 980,000 lbs. The unloaded vehicle weighed approximately 500,000 lbs. These vehicles are extremely large and dangerous and can easily cause serious injury and death if not operated safely.

9

\* \* \*

13. As the operator of a Komatsu 830, you are sitting in the driver's seat on the left front of the vehicle. The deck that your seat is attached to is approximately 15 to 17 feet above the ground. Depending on the box being used, the vehicle is approximately 24 to 27 feet wide and 45 to 50 feet long. Looking forward you cannot see the ground for 15 to 20 feet in front of you. Looking to the left, you can't see the ground for approximately 3 to 5 feet from the side of the vehicle. You are approximately 20 feet from the right hand side of the vehicle. Because of the height and distance, you cannot see the ground for approximately 50 to 70 feet to the right of the vehicle. . . .

Doc. 67-2.

Prior to and on October 13, 2013, the ramp that was being traveled was a one-way road. It had not been widened to allow safe passage of two of the largest trucks used at the mine at the same time, although it was feasible to do so. Vincent says he stopped at the top of the access ramp and waited until he received an "all clear" signal to drive down into the pit. As he was driving, he says he saw the headlights of another haul truck approaching and then pulled off to the left side of the 4-East Access Ramp and flashed the lights of his haul truck at the approaching vehicle. Nelson was driving the loaded haul truck up the access ramp, after Vincent had been given the "all clear" signal to descend into the pit. Nelson was operating one of the largest haul trucks at the mine and instead of stopping to avoid the hazards presented with the two haul trucks on same the narrow and hazardous section of haul road, Vincent claims that she tried to ram past the haul truck he was driving. She struck Vincent's truck, and instead of stopping she accelerated and continued to ram her haul truck into and past Vincent's haul truck. Vincent claims that the impact of the collision caused his haul truck to rock and pitch, damaging the truck and causing him serious injury. Vincent alleges that Nelson's conduct constitutes willful and wanton misconduct, and was

the intentional doing of or failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would in a high degree of probability, result in harm to another. Such conduct deprives the employee of the immunity conferred by the Wyoming Worker's Compensation Act.

Nelson's deposition testimony offers a different version of the incident. Nelson had been working at BTM since 2005. Doc. 67-8, 6-7. Nelson says that she was not aware that the ramp to Shovel Number 5 was a one-way road. Doc. 67-8, 34.[1] She could not recall whether her supervisor, Mike McGinty had advised the drivers that the 4 East ramp to Shovel 5 was a one-way road, during the pre-shift meeting for employees. *Id.* She had no recollection of any "narrow road" signs on the left-hand side of the road. *Id.* at 40. She knew the road was narrow and that it was even narrower in certain places as well. *Id.* at 48-49. On one run she came around a bend in the narrow road and says she then saw a truck without headlights on; she could see the side marker lights and knew there was a truck there. Knowing there was another truck in the roadway, Nelson proceeded forward. She says that she had made that choice based on what had been done all night long there and saw no risk in making that decision. She did not call the driver in the truck on the side of the road (Vincent) because she didn't think she needed to, thinking it was a safe spot. As she passed that truck, Nelson says her "mirror clipped the truck" and that she came to a stop. She says she did not start up and drive forward again; she did not move her truck again at all, in contrast to Vincent's claims. "He's the one that moved his truck." She stopped, called

---

[1] McGinty's deposition testimony stated that he informed at the line-out meeting Nelson and other drivers that the 4 East ramp to Shovel 5 was a one-way road. Doc. 67-6, 68-69.

her supervisors and simply sat and waited. *Id.* at 66-68.

The mine's General Manager Hampleman is in charge of all operations and maintenance and safety at the mine. Doc. 67-25, 9. Hampleman agreed that every driver of a haul truck confronted with a truck coming downhill on a narrow road should stop. Doc. 67-15, 34. After the collision, an MSHA investigation was conducted. TBCC received a Mine Citation/Order from the Mine Safety and Health Administration following the October 13, 2013 incident. The condition or practice causing issuance of the citation was described:

> On 10-13-2013, the driver of the loaded Komatsu 830 Haul Truck (#132) was not operating at speeds prudent with the conditions when it entered a marked narrow section of roadway on the 4-East Access Ramp that was already occupied by a stopped Komatsu 830 Haul Truck (#129) which resulted in a collission [sic] between the two vehicles. This hazard would result in injuries including lacerations, contusions, and fractures. This ramp was being utilized by five (5) haul trucks and one (1) blade during a normal operating shift.

The MSHA citation found the gravity of the incident to be significant and substantial. Section 17, entitled "Action to Terminate" states:

> Miners were reinforced if there is not sufficient clearance to pass, to stop and not proceed until adequate distance is established. This roadway was widened. Given all of this, this citation is terminated.

This document is dated October 31, 2013. Doc. 67-16.


## Defendant's Motion for Summary Judgment

Nelson's argument asks again, as already addressed by the Court in the orders ruling on the motion to amend complaint and motion to dismiss, whether a theory of co-employee liability precludes recovery by Vincent in this case. The short answer is that it does not. The Court

persists in the analysis set forth in the order denying the defendants' motion to dismiss and this additional attempt to revisit this question has not persuaded the Court that the earlier decision is not appropriate. While discovery has developed the facts more fully, those facts, as presented in the parties' submissions here, do not turn the earlier discussion of the incident into undisputed material facts that would entitle Nelson to judgment as a matter of law. The Court refers the parties to the discussion in the order on the motion to dismiss and the earlier motion to amend the complaint addressing co-employee liability and will not restate the Rule 12(b) analysis again.

The governing statute is not ambiguous. It states when co-employees may be liable for injuries and will not be entitled to Worker's Compensation immunity, discussed in the Court's earlier order on the motion to dismiss:

Wyo. Stat. § 27-14-104 provides:

§ 27-14-104. Exclusive remedy as to employer; nonliability of co-employees; no relief from liability; rights as to delinquent or noncontributing employer

(a) The rights and remedies provided in this act for an employee including any joint employee, and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer and any joint employer making contributions required by this act, or their employees acting within the scope of their employment **unless the employees intentionally act to cause physical harm or injury to the injured employee, but do not supersede any rights and remedies available to an employee and his dependents against any other person.**

[* * * (b) and (c) omitted in this summary judgment order].

(Emphasis supplied.)

The Wyoming Court reversed a decision of the district court granting a motion for summary judgment by co-employee supervisors asserting that they were entitled to immunity in a negligence action brought against them by an employee.

13

*Bertagnolli v. Louderback*, 67 P.3d 627 (Wyo. 2003). The Wyoming Court held that there were material issues of fact regarding the co-employee supervisors' knowledge of the general risks of working near a shuttle belt and whether the supervisors' actions constituted willful and wanton misconduct within the meaning of the Workers' Compensation Act granting co-employees immunity except for intentional acts and willful and wanton misconduct. In that case, the supervisors argued that the employee had failed to show they had actual knowledge of the dangerous condition and had presented only mere inferences drawn from alleged violations of safety policies and practices. The argument was unpersuasive. The Wyoming Court found that the employee was entitled to have the jury determine whether the evidence, which included the supervisors' testimony, together with evidence presented regarding their intentional acts, demonstrated that the supervisors intentionally acted to cause physical harm or injury and constituted willful and wanton misconduct. *Bertagnolli v. Louderback*, 67 P.3d at 635. See also, *Calkins v. Boydston*, 796 P.2d 452, (Wyo. 1990); *Herrera v. Phillipps*, 334 P.3d 1225 (Wyo. 2014). In this case, as to the co-employee who is not a supervisor, Nelson, nothing in the governing statute distinguishes between supervisory or non-supervisory employees. The statutory language is explicit as to all co-employees and should be given effect. Where an employee intentionally acts to cause physical harm or injury to the injured employee, the grant of immunity to co-employees under the statute is not applicable. A co-employee claim can be asserted against a co-employee who is not a supervisor and supervisory employees. Additionally, the statutory grant of immunity of Wyo. Stat. § 27-14-104 covers all but intentional acts to cause harm of injury and willful and wanton misconduct.

Doc. 35.

In the summary judgment context, Nelson again argues that she cannot be held liable under a theory of co-employee liability. She first asserts that Vincent must demonstrate she had "direct responsibility" for his safety and work conditions. She argues that the evidence she did not have direct responsibility and that her only duty was a generalized duty for the safety of all employees at the mine. The cases she cites do not clearly support such a proposition. *Formisano v. Gaston*, 246 P.3d 266 (Wyo. 2011) was a case considering whether a co-employee supervisory defendant was entitled to summary judgment. In that case one co-employee, who had assumed some tasks formerly performed by a crew leader who had quit, fell asleep at the wheel while he and another

passenger co-employee were driving back to Gillette after a shift change. The passenger co-employee suffered injuries in the accident. The driver violated company policy by driving when he was too tired to drive safely. 246 P.3d at 290. The Wyoming Court reiterated that the Worker's Compensation Act remedies are in lieu of other rights and remedies a covered employee who is injured on the job may have against his employer. It further noted that such immunity extends to co-employees who may have acted to cause harm, so long as that co-employee did not intentionally act to cause physical harm or injury to the injured employee. In other words, a co-employee is not liable to the other co-employee if he is merely negligent. *Id.*

The issue of importance in that case was the distinction between simple negligence of a co-employee causing injury or the co-employee's state of mind approaching an intent to do harm, as required by the statute. There is no discussion in that opinion about "direct responsibility" as Nelson argues now; rather the discussion in *Formisano* focuses on when a co-employee is entitled to immunity. In *Formisano*, the plaintiff passenger co-employee argued that the high standard of misconduct that would allow a claim for co-employee liability under the statute when the driver treated the passenger rudely, was untruthful while speaking with the passenger or the company supervisors by purposefully misleading supervisors to obtain overtime pay, and by intentionally driving while sleep deprived. The Wyoming Court was not persuaded by this argument and determined that the conduct envisioned by the statute excepting a co-employee from immunity required more than driving while tired or falling asleep at the wheel and distinguishing the cases that *Formisano* had relied upon.

*Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169 (Wyo. 1989) is cited by Nelson

and is not particularly persuasive. In *Stephenson,* the plaintiff, who was injured when he fell from a scaffolding, sued several of his Combustion Engineering co-employees alleging culpable negligence and also sued Pacific Power (PP&L), the property owner and one of its employees alleging negligence. Combustion Engineering had been engaged by PP&L to provide engineering and maintenance services at the Jim Bridger Power Plant. Plaintiff alleged that his Combustion Engineering co-employee defendants had failed to respond to his repeated complaints and requests to have a doorway flagged or barricaded where the scaffolding had been located, and that the failure to do so was culpable negligence resulting in the plaintiff's injuries. The state district court granted summary judgment to co-employee defendants because there was no evidence they had engaged in willful or wanton misconduct, or had not possessed a state of mind approaching an intent to do harm, and thus the claims of culpable negligence failed. After discussing the statute[2], the court reckoned that culpable negligence is defined as "willful and serious misconduct done purposely, with knowledge, or misconduct of such character as to evince a reckless disregard of consequences — the distinguishing factor being the actor's state of mind." *Id.* at 1174. The co-employees did have supervisory responsibilities, owing a duty to provide safe working conditions and they had knowledge of the hazardous situation. *Id.* Such knowledge was conceded, but the co-employees asserted although their conduct may have been negligent it was not willful or did

---

[2]The case was then governed by the Wyoming Worker's Compensation Act, Wyo. Stat. § 27-12-103, which was repealed in 1986 and replaced by the now-current exclusive remedy provision at issue in this case, Wyo. Stat. § 27-14-104 (1977), which includes the exception that allows actions against co-employees where "employees intentionally act to cause physical harm or injury to the injured employee[.]"

not demonstrate a state of mind approaching an intent to do harm. *Id.* at 1175.

*Hannifan v. American National Bank of Cheyenne, as Conservator of the Estate of Leslie Roy "Les" Butts et al.*, 185 P.3d 679 (Wyo. 2008) was a case where the plaintiff sued the mine manager and safety manager alleging their conduct was intentional or willful and wanton misconduct in connection with the accident in which the miner was injured and rendered paraplegic. After a jury trial, and later on appeal, the Wyoming Court found the evidence was sufficient for the Worker's Compensation exception to immunity to apply and that the case could proceed against the mine manager and safety manager co-employees of the plaintiff, although neither directly supervised Butts, the injured employee, at the time he was injured. They each did have direct supervisory authority for his safety and working conditions the day he was injured, but it is not clear that the supervisory role was driving the court's decision. In the *Hannifan* opinion, *Bertagnolli* was recognized as a complete restatement of Wyoming jurisprudence on the issue of co-employee liability and the "delicate constitutional 'quid pro quo' that underlies worker's compensation benefits." 185 P.3d at 682.

The *Hannifan* court went on to address *Bertagnolli v. Louderback*, 67 P.3d 627, and quoted from that opinion, where the Wyoming Court had stated:

> [W]e consistently held the requirements of the statute and the standards of willful and wanton misconduct were met when the evidence demonstrated the **co-employee had knowledge of the dangerous condition and demonstrated a disregard of the risks through intentional acts**. With this standard in mind, we now must review the evidence submitted by Mr. Bertagnolli to determine whether it was sufficient to create a genuine issue of material fact with regard to the supervisors' **knowledge of the dangerous condition and whether they acted intentionally in disregard of known risks.**

185 P.3d at 684. (Bold emphasis supplied.)

As to the allegation that Nelson had knowledge of the hazard and acted with reckless disregard, Nelson argues that the undisputed material facts establish she neither had nor should have had knowledge of the hazard or that she acted with reckless disregard. Whether this is so or not, the materials before the Court now demonstrate unequivocally that a dispute exists as to whether she knew of the hazard and whether she acted with reckless disregard of the hazard. Nelson's own descriptions of the collision have been a moving target. By way of example, she first did not claim Vincent's truck was moving. After she was taken to the mine office, she claimed Vincent was responsible and his truck was moving. She stated she saw some lights, thought it was light from the breaker house, although she was told by supervisors that the breaker house was not visible from her location. She later claimed she did not see Vincent's truck until the last minute and then just decided to "go for it." Doc. 67-9.

The concluding statements included in the investigation notes prepared after the collision by TBCC/BTM representatives included the following:

### SUMMARY OF INVESTIGATION

All employees on the 5 shovel run, with the exception of Ava Nelson, heard Dale Vincent call on channel 34 requesting and receiving clearance to enter the 5 shovel run.

Ava Nelson, operating HT132 admitted she saw a truck on the road as she was advancing up the ramp. Supervisor, Mike McGinty investigated the accident immediately after it occurred. Ava Nelson apologized, then changed story to say Dale's truck was in motion, thus making him responsible. Dale Vincent claims he was pulled over and stopped. In fact the evidence at the accident scene and the Minestar report confirms that Dale was indeed stopped at the time the trucks made contact. As Ava approached the truck parked on the road, she thought since she

had successfully met and passed another truck at the same narrow place in the road earlier that night, she decided to "go for it".

Unfortunately, she wasn't far enough over and her truck made contact with Dale's truck. After her truck hit his truck, she stopped, and then resumed pulling forward. A pin on the tailgate of HT132 hung up on the box of HT129 causing Dale's truck to rock back and forth to a point he thought his truck would turn over. Dale Vincent was diagnosed with an abdominal hernia, requiring surgery, from straining and bracing for the impact.

### TERMINATION PHONE CALL

Jack told Ava that the truck incident investigation has concluded. The decision she made to proceed by the truck she was approaching resulted in property damage, injury to a coworker and a lost time injury for the mine. As a result, her employment would end. Ava corrected Jack that two employees had been injured, as she was including herself.

Doc. 67-9, Ex. 9.

Jack explained that this is an extremely serious situation that we cannot tolerate. Ava said that she expected the company would take this action.

Doc. 67-10.

Nelson has argued that she was only charged with general safety duties, like all other workers and equipment operators and that because she did not have direct supervisory control over the plaintiff she could not be liable. This argument simply reaches too far. The facts are clearly disputed. Nelson says she did not have the "request [sic] knowledge of the hazard, nor did she act with reckless disregard." The Court is not persuaded by Nelson's contention that plaintiff's arguments are merely inflammatory rhetoric and cannot support his position. The inflammatory rhetoric defendant objects to is the statement that Nelson was "playing russian roulette with a 980,000 pound haul truck" (Doc. 68) in her response to the defendant's motion

19

for summary judgment. It is the conduct of Nelson at issue here; the descriptors used by either party to magnify or minimise Nelson's conduct are of little consequence. Nelson's claim that she did not have knowledge of the hazard and did not act with reckless disregard is indeed something that is in dispute here, as reflected in the discussion above.

Again, the assertion that Nelson could only be liable if she was Vincent's direct supervisor reaches too far and continues to be unpersuasive. The statutory grant of immunity to co-employees in Wyo. Stat. § 27-14-104 covers all but intentional acts and willful and wanton misconduct. *Bertagnolli v. Louderback*, 67 P.3d 627, 632 (Wyo. 2003). As the *Bertagnolli* court stated, the standard of "intentionally act to cause physical harm or injury" equates to willful and wanton misconduct. and the Wyoming court persisted in its own earlier discussions of willful and wanton misconduct. It stated:

> We continue to believe the concept of willful and wanton misconduct has essentially the same legal effect as the statutory language "intentionally act to cause physical harm or injury." Well before the 1993 amendment to § 27–14–104(a), this court expressly defined willful and wanton misconduct in terms of intentional actions:
>
>> Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.
>
> *Weaver v. Mitchell*, 715 P.2d 1361, 1370 (Wyo. 1986) (emphasis added); see also *Mayflower Restaurant Company v. Griego*, 741 P.2d 1106, 1115 (Wyo. 1987). In addition, one of the bases of the *Mills* decision was the conclusion that allowing immunity for intentional acts and willful and wanton behavior violated the constitution, and the legislature's response to that decision was the adoption of the statute granting immunity except for intentional acts. *Mills*, 837 P.2d at 55.

Our conclusion that the statutory grant of immunity covers all but intentional acts and willful and wanton misconduct is consistent with the parameters of statutory construction:

> "All statutes are presumed to be enacted by the legislature with full knowledge of the existing state of law with reference thereto and statutes are therefore to be construed in harmony with the existing law, and as a part of an overall and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to the decisions of the courts."

*Fosler v. Collins*, 13 P.3d 686, 689 (Wyo. 2000) (quoting *Voss v. Ralston*, 550 P.2d 481, 486 (Wyo.1976)); see also *Andersen*, 2002 WY 105, ¶ 22, 49 P.3d 1011, ¶ 2.

67 P.3d at 632-633.

The allegations here, having considered the parties' submissions, are sufficient to demonstrate that the jury could reasonably find that Nelson's conduct was willful and wanton, or consistent with the language of the statute, that she intentionally acted to cause physical harm or injury to the injured employee in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. Equally possible, the jury might accept Nelson's explanation and her version of the events in question and find she had not committed an intentional act to cause physical harm or injury and that her conduct was not willful and wanton. If the jury so found, the exclusive remedy for the injured employee would be governed by the provisions of the Wyoming Worker's Compensation Act, Wyo. Stat. §§ 27-14-104, and she would receive the benefit of the statutory grant of immunity afforded to co-employees who may have been merely negligent.

The Court persists in the analysis contained in the earlier orders entered discussing the immunity conferred upon co-employees under the Wyo. Stat. § 27-14-104 and the exception to immunity where the co-employees act intentionally to cause physical harm or injury to the injured employee. The Worker's Compensation Act does not require the co-employee causing injury to the plaintiff to be a direct supervisor of the injured plaintiff. Again, the Worker's Compensation Act provides the exclusive remedy for an injured employee for all but the co-employee's intentional acts to cause physical harm or injury to the injured employee or where the co-employee's conduct is willful and wanton. This is the type of conduct that goes beyond mere negligence. Vincent's allegations allow the inference that Nelson's conduct was beyond the purview of mere negligence and an ordinary lack of due care and suggest that her conduct was intentional or willful and wanton. Although all of the parties have put contrasting spin on their versions of the facts in their favor, upon review, the Court concludes that the material facts are indeed in genuine dispute and that neither party is entitled to judgment as a matter of law and requires the jury to assess credibility of the parties and witnesses. These are matters that are particularly appropriate for consideration by a jury, after receiving and considering all the evidence and testimony, and following the Court's instructions that will guide the decision in reaching a verdict. The defendant's motion for summary judgment will be denied in its entirety.

Accordingly, it is therefore

**ORDERED** that the defendant's motion for summary judgment (Doc. 64) shall be, and is, **DENIED.**

Dated this _17th_ day of June 2019.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE